IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 11 CR 0750 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JASON CORREA and | ) | |
| SAUL MELERO | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants Jason Correa and Saul Melero's joint motion to suppress evidence [74, 75]. For the reasons below, Defendants' motion is denied.

**I.  Background**

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe").  In this case, the Court conducted a suppression hearing that spanned parts of April 18, 2013 and May 2, 2013, during which counsel for Defendants Correa and Melero and counsel for the Government presented the testimony of six witnesses:  Defendant Correa, Drug Enforcement Administration ("DEA") Special Agents Thomas Asselborn and Craig Schwartz, DEA Task Force Officers Mike Giorgetti and Steve Hollister, and DEA Group Supervisor James Laverty.  After considering the testimony of the witnesses and assessing their credibility, the Court sets forth the following recitation of the

facts surrounding the encounters between the Defendants and DEA officers that gave rise to the federal charges against the Defendants and their motion to suppress currently before the Court.

On October 19, 2013, DEA agents surveilled a brief meeting between a confidential source ("CS") and two unknown males ("UM1" and "UM2") inside a restaurant at 53rd and Pulaski in Chicago, Illinois. After the meeting, UM1 and UM2 swapped cars with the CS; the CS left the restaurant in the red GMC Canyon truck in which UM1 and UM2 had arrived, while UM1 and UM2 drove away in the vehicle originally driven by the CS. DEA Agents followed UM1 and UM2 and observed them enter a parking garage near the intersection of 18th and South Prairie. Roughly 25 minutes later, the agents saw UM1 and UM2 emerge in the CS's vehicle from the parking garage attached to 1717 South Prairie and drive back to 53rd and Pulaski, where they again met the CS, switched back to their original vehicles, and left. DEA Agents then met with the CS, discovering $500,000 in cash that was not in his vehicle prior to the meeting, while other DEA agents followed UM1 and UM2 to a residence in Lyons, Illinois.

Eight days later, on October 27, 2011, DEA agents, including Special Agent Asselborn, surveilled the Lyons, Illinois residence. Around 1:40pm, the agents observed UM2 exit the residence's garage in the same red GMC Canyon truck. DEA Agents then followed UM2 to a grocery store in the area of Canal Street and Roosevelt Road in Chicago, where he parked in the lot next to a silver Jeep Cherokee at 3:08pm. There, SA Loonan observed UM2 meet with an unknown male, later identified as Defendant Correa, in the Starbucks within the grocery store, while SA Schwartz conducted surveillance of the parking lot. Soon after, the two men left the store and walked to UM2's red Canyon truck, where UM2 pulled out a multi-colored bag and handed it to Correa, who placed it in the rear passenger side of his Jeep. Correa then left the parking lot in the Jeep and headed south on Canal Street. At that point, SA Asselborn instructed

2

task force officers over DEA radio to initiate a traffic stop if they observed probable cause to conduct one. TFO Giorgetti followed Correa by a distance of two car lengths, and TFO Hollister trailed Giorgetti in another car.

Correa continued south on Canal Street until 18th Street, where TFO Giorgetti observed him turn left without using his turn signal. Farther down 18th street, TFO Giorgetti activated his emergency lights and siren and pulled over Correa near the intersection of 18th Street and Wabash. Donned in a bulletproof vest marked "Police" on both sides, TFO Giorgetti approached the driver's side of the truck, as TFO Hollister approached the passenger side of the vehicle. After asking Correa for his license and registration, TFO Giorgetti asked Correa if he had anything illegal in the Jeep. When Correa answered in the negative, TFO Giorgetti asked if he could search the vehicle, to which Correa replied, "go ahead." TFO Hollister witnessed the exchange.

While TFO Giorgetti searched the vehicle, TFO Hollister conducted a pat down of Correa on the side of the road. TFO Giorgetti found a Chicago Bears bag, with a black plastic bag inside, located on the floor behind the passenger seat. Inside the black plastic bag was a clear plastic bag, containing what TFO Giorgetti believed to be cocaine. At that point, TFOs Giorgetti and Hollister took Correa into custody and transported him to the DEA office, where TFO Hollister administered his Miranda rights and turned Correa over to Group Supervisor ("GS") Laverty.

Before Correa was taken from the scene of the traffic stop, SA Asselborn arrived and found a bag on the front passenger seat that contained four garage door openers, three sets of keys, and four cell phones. SA Asselborn took the bag and drove to 1717 South Prairie – the building from which UM1 and UM2 emerged eight days earlier in a car containing $500,000 in

cash – to determine if the garage door openers worked at that address. When none of them opened the garage, SA Asselborn spent roughly 10-15 minutes testing the garage door openers on nearby buildings until he finally had success at 1819 South Michigan Avenue, a ten-story apartment and condominium building. SA Asselborn then instructed SAs Loonan and Barnum to meet him at the front entrance, where they gained access to the lobby using a key fob from the bag. Inside the lobby, SA Asselborn tested a key from the same key ring that contained the fob on a number of the building residents' mailboxes, eventually finding its match in the mailbox for unit 702. Believing this to be Correa's home, SA Asselborn contacted GS Laverty and asked if Correa would consent to a search of the unit. At about 4:50pm, in a small interview room where Correa was not handcuffed, GS Laverty asked Correa if the agents could search unit 702. Correa replied, "go ahead and search it," but refused to sign a written consent form. SA Asselborn and the other agents then conducted the search.

Using keys from the bag he recovered from the Jeep, SA Asselborn opened the front door to the one-bedroom unit. In the kitchen, agents recovered numerous items typically used in the packaging of narcotics for sale on the street, including: zip lock bags, heat seal bags, a heat sealer, rubber gloves, a rubber mallet, a rolling pin, two digital scales, and a grinder with white powdery residue. In addition, agents found checks in the name of Saul Melero, mail addressed to Saul Melero, Saul Melero's birth certificate, a receipt for furniture and a utility bill for another address in Saul Melero's name, a marriage certificate for Saul Melero and Veronica Martinez, a court order from a case captioned Veronica Martinez Melero v. Saul Melero, a box of checks in the name of Marcelina Sanchez, and utility bills to Alfredo Melero for unit 702. In the living room, agents found a piece of mail from the U.S. government addressed to Saul Melero that contained a passport photograph, as well as a piece of paper that appeared to be a drug ledger.

SA Asselborn used keys from the bag to open the locked bedroom door and a black hard plastic case found on the bedroom floor. The bedroom contained marijuana, two kilo presses, and boxes of Dormin. The locked black box contained 1.9 kilograms of a substance that field tested positive for cocaine, 1.4 kilograms of a substance that field tested positive for heroin, 538 grams of a substance that tested positive for marijuana, a bag of pills that field tested positive for Ecstacy and methamphetamine, 18 boxes of Dormin that contained 72 capsules each, a bottle of Inositol (a cutting agent for cocaine), two breathing masks, and a .32 caliber semiautomatic handgun.

Agents showed photos of Correa to neighbors, who believed him to be a resident of unit 702. One neighbor said she had seen packages in the mailroom addressed to S. Melero of unit 702. After the search, one of the neighbors approached the agents to inform them that the other resident of unit 702 was standing outside on Michigan Avenue in front of a white SUV. The neighbor then pointed out the person – who turned out to be Saul Melero – to the agents. Coincidentally, GS Laverty was out front at that time, waiting be let into the building. SA Branum relayed the description of Melero to GS Laverty, who got in his car and drove down ahead of Melero on the street. With his gun in "low ready position," Laverty ordered Melero to the ground, and other agents arrived and handcuffed him.

## II.     Analysis

Correa argues that his Fourth Amendment rights were violated and that all evidence must be suppressed because: 1) the agents lacked authority to effectuate a traffic stop for failure to use his left turn signal, 2) the agents lacked both probable cause and reasonable suspicion to lawfully pull him over for a drug offense, 3) he never consented to a search of his vehicle, 4) even if he did, the agents exceeded the scope of that consent, 5) SA Asselborn's taking and use of the

5

garage door opener, fob, and keys constituted an illegal search and seizure, 6) he never consented to a search of unit 702, and 7) even if he did, any of the agents' earlier illegal actions tainted the consent, rendering the search of the apartment unconstitutional. The Government argues that the agents had reasonable articulable suspicion to pull over Correa's Jeep, Correa voluntarily consented to its search, SA Asselborn acted constitutionally with respect to the keys, and Correa consented to a search of unit 702.

Melero argues that: 1) Correa lacked apparent authority to consent to a search of unit 702, and 2) the agents lacked probable cause to arrest Melero. The Government maintains that Correa had both actual and apparent authority to consent to the unit's search and that probable cause supported Melero's arrest.

A.    **The Lawfulness of the Traffic Stop**

In their motion to suppress, Defendants contend that TFO Giorgetti lied when he testified that Correa failed to use his left turn signal, and that, in reality, the stop was unsupported by probable cause of a traffic violation. To attack Giorgetti's credibility, Defendants point to his testimony that he has authority as a Willow Springs, Illinois police officer to conduct traffic stops in Chicago. Defendants cite Illinois law that suggests the inaccuracy of Giorgetti's claim to argue that Giorgetti lied at the suppression hearing, and that Correa's testimony that he did, in fact, use his turn signal should be believed. In response, the Government highlights the various motivations Correa has to lie. In their reply, Defendants argue for the first time that the traffic stop was unlawful because neither his title as a Willow Springs police officer nor his status as a DEA Task Force Officer authorized Giorgetti to conduct the traffic stop.

Of course, if TFO Giorgetti had authority to conduct traffic stops in the city of Chicago, his observation that Correa failed to use his turn signal in the designated left turn lane – an

6

observation that TFO Hollister said Giorgetti announced in real-time over DEA radio and that the Court finds credible – would have given him probable cause to pull over Correa, regardless of pretext or Giorgetti's subjective intentions. See *Wren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he constitutional reasonableness of traffic stops [does not depend] on the actual motivations of the individual officers involved."); see also *United States v. McDonald*, 453 F.3d 958, 961-62 (7th Cir. 2006) ("An officer has probable cause for a traffic stop when she has an 'objectively reasonable' basis to believe a traffic law has been violated."). The Court need not address the authority issue, however, because the fact that the agents had reasonable articulable suspicion of a drug transaction renders it moot.

DEA Agents may stop and briefly detain a person for investigative purposes if they have reasonable suspicion supported by articulable facts that criminal activity may be afoot. *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989) (relying on *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Although probable cause means "a fair probability that contraband or evidence of a crime will be found," the level of suspicion required for a *Terry* stop is less demanding. *Id.* In evaluating the legality of the stop, the Court must consider the totality of the circumstances, and the Agents must be able to articulate more than an "unparticularized suspicion or hunch." *Id.* at 7-8.

Here, the DEA agents articulated ample reason to suspect that Correa had engaged or was engaging in an illegal transaction. Agents observed Correa briefly meet in a coffee shop with UM2, who eight days prior placed $500,000 in another man's car after a similarly brief meeting at a restaurant. Agents suspected UM2 of involvement in a large-scale drug and/or money laundering operation being run out of 1717 South Prairie, the suspected "stash house" from which Agents' believed UM2 obtained the $500,000. After the brief meeting between UM2 and Correa, UM2 handed Correa an unknown package, with which Correa then drove off in the

direction of 1717 South Prairie. Agents followed Correa for more than a mile before pulling him over just a few blocks shy of the stash house. These observations made up much more than an unparticularized hunch. Agents articulated specific facts that amounted to an objectively reasonable suspicion that Correa had committed or was about to commit a crime, such that they were justified in initiating an investigatory stop.

### B. The Legality of the Search of the Vehicle

Correa contends that he never consented to the search of his Jeep, and that if he did consent, he did so involuntarily after he was ordered out of the car at gunpoint. In the alternative, Correa argues that he only consented to a search for "illegal" items, and that the agents exceeded the scope of his consent when they seized items which are not themselves contraband (i.e. garage door openers and keys).

On the credibility issue of whether Correa consented to the search, the Court finds TFO Giorgetti's account to be the more believable one. The Court bases this on both Giorgetti's demeanor at the suppression hearing and the corroboration of his account provided by TFO Hollister. TFO Hollister testified that while TFO Giorgetti spoke with Correa through the driver's side window, he was standing at the passenger side and heard Correa give consent. Tr. at 157-59. Correa agreed that an agent stood at the passenger side window as he spoke with Giorgetti. *Id.* at 188. Moreover, Correa's account of the traffic stop left the Court questioning his version of events. Correa's testimony suggested that Agent Giorgetti opened all car doors, including the Jeep's rear hatch, and searched the entire car before finally discovering the multicolored bag containing cocaine. Tr. at 190-92. This version does not comport with how the Court would expect this search to have transpired, given that the traffic stop was effectuated to investigate the contents of the multicolored bag and that the bag's location in the car was already

known to the officers. It seems much more likely that the bag would have been the first thing searched by the officers. As such, the Court credits the accounts of TFOs Giorgetti and Hollister and finds that Correa consented to a search of the car.

Further, the Court determines Correa's contention that his consent was involuntary – an argument he raised for the first time in his reply brief – to be without merit. Correa's claim that Giorgetti pointed a gun at his head was contradicted by TFO Hollister, the only other witness present. And the suggestion in Correa's reply brief, Def. Reply at 12, that Giorgetti never advised Correa that he stopped him for a traffic violation is contradicted by Correa's own testimony. Tr. at 187 ("Then he approached my vehicle and told me that it was a traffic stop."). Further, the factors that the Seventh Circuit considers in determining whether a defendant voluntarily consented heavily weigh in the Government's favor: (1) the defendant's age, intelligence, and education; (2) whether the defendant was advised of his constitutional rights; (3) how long the defendant was detained prior to giving consent; (4) whether the consent was immediate, or was prompted by repeated requests by authorities; (5) whether any physical coercion was used; and (6) whether the defendant was in police custody when he gave his consent." *U.S. v. Pineda-Buenaventura*, 622 F.3d 761, 776 (7th Cir. 2010). Correa was 30 years old at the time of his arrest, is a fluent English speaker from Chicago, and completed two years of high school. Although Correa was not advised that he could refuse consent, he previously had been arrested fifteen times for a variety of offenses, several of which stemmed from traffic stops. Correa consented immediately to Giorgetti's first request, and within a very short time of being pulled over. Finally, no physical coercion was used and Correa was not yet in police custody. Accordingly, the Court finds that Correa consented voluntarily.

Correa's argument that the search and seizure of the garage door openers and keys exceeded the scope of his consent is likewise unpersuasive. The scope of consent "is limited by the breadth of actual consent, and whether the search remained within the boundaries of consent is a question of fact to be determined from the totality of the circumstances." *U.S. v. Long*, 425 F.3d 482, 486 (7th Cir. 2005). TFO Giorgetti asked Correa if he could search the car, and Correa responded, "go ahead." Giorgetti's earlier question as to whether the car contained anything illegal did not somehow limit – as Defendants argue – the breadth of Correa's consent to a search of only those items which were in "plain view," or restrict the items which could be seized to only those which are by themselves illegal. Regardless, Correa testified that TFO Giorgetti was wearing a jacket that said "DEA" on it when he asked for consent, Tr. at 187, so Correa knew that Giorgetti would be searching for drugs. Since a bag large enough to hold several garage door openers is, of course, large enough to contain drugs, there is no question that the breadth of Correa's consent included a search of the bag.

Correa's argument that the seizure of the garage door openers exceeded the scope of Correa's consent also falls flat. He cites no authority for his argument that a suspect, after giving consent to search his vehicle, can restrict the *seizure* of items to only those that are themselves contraband. In fact, in Defendants' reply brief, they acknowledge that "when, upon authorized inspection, the items at issue reveal themselves to be incriminating or lead to incriminating evidence, they may be seized." Def. Reply at 17. Once Correa consented to the search of the Jeep, the Agents were permitted to seize any contraband or evidence of a crime that they found. See *U.S. v. Loera*, 565 F.3d 406, 411 n.3 (7th Cir. 2009).

Moreover, the automobile exception to the warrant requirement provided SA Asselborn with further justification for his search and seizure. Once TFO Giorgetti discovered the bag of

cocaine, the agents had probable cause to search the entire car and seize all evidence of a crime. See *U.S. v. Johnson*, 383 F.3d 538, 545 (7th Cir. 2004). Given the nature of the crimes that the agents were investigating – specifically, a drug and money laundering operation that involved both the switching of cars and access to apartments where the drugs or money are kept – it was reasonable for SA Asselborn to infer that a bag filled with an assortment of garage door openers, keys, and cell phones was evidence. See *U.S. v. Eschweiler*, 745 F.2d 435, 439 (7th Cir. 1984) (finding it lawful for an agent, executing a search warrant for drugs and money, to seize the key to a safe deposit box after discovering cocaine, since it was reasonable to infer the box may contain cocaine or money from the sale of cocaine); see also *Kykta v. Washington*, No. 96-1799, 1997 WL 58860 at *3 (7th Cir. Feb. 5, 1997) (citing *Eschweiler* as validation of an officer's immediate perception of a connection between five safe deposit box keys and a drug offense; the presence of cocaine made it a reasonable to infer that the safe deposit boxes probably contained drugs and/or proceeds from drug trafficking).

Finally, Defendants' reliance on *Arizona v. Gant*, 556 U.S. 332 (2009) is wholly misplaced. *Gant* placed limitations on vehicle searches performed incident to a recent occupant's arrest, and has no bearing on searches, like the one here, justified by consent and probable cause.

### C. SA Asselborn's Use of the Garage Door Openers and Keys

Defendants argue that SA Asselborn's use of the garage door openers and keys, which enabled him to identify unit 702 of 1819 South Michigan Avenue as Correa's home, constituted an illegal search in violation of their Fourth Amendment rights. On a remarkably similar set of facts, however, the Seventh Circuit made clear that the actions taken by SA Asselborn do not offend the Constitution. *U.S. v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991). In *Concepcion*,

11

DEA agents arrested the defendant and seized his keys. *Id.* at 1171. When the agents noticed the name "Concepcion" on the mailbox of a nearby apartment building, they tested Concepcion's keys, one of which opened the door to the lobby. *Id.* Once inside the common area, the agents tested the other keys and successfully opened the door to apartment 1C. *Id.* Having identified the correct apartment number, agents sought and obtained consent from Concepcion to search the unit. *Id.* The Seventh Circuit found that Concepcion could not have a reasonable expectation of privacy in the common area of the apartment building, because it was shared by other tenants. *Id.* at 1172. Therefore, even the agents' use of keys to enter the locked area did not constitute an unlawful search. *Id.* The Court did, however, deem the agents' use of Concepcion's key in the lock of apartment 1C to be a "search," finding the apartment's keyhole itself to be within the protected zone of privacy, since it reveals personal information and is not accessible to strangers. *Id.* at 1172-73. However, the Seventh Circuit found that the privacy interest in a keyhole is so slight that a "search" of the lock (*i.e.* mere use of the key) need not be supported by probable cause. *Id.* at 1173.

Applying the Seventh Circuit's rationale to Correa and Melero's case, the Court sees no violation of their constitutional rights. As in *Concepcion*, the Defendants had no reasonable expectation of privacy in the common area of the building; therefore, the use of the key fob to enter the lobby was not a search at all. The use of the mail key to determine its match with the box for unit 702 was less of an intrusion into their zone of privacy than the agents' use of Concepcion's key to the unit itself. So though technically a "search," the agents did not need an exception to the warrant requirement to turn the mail key to identify its corresponding unit number. Nor was SA Asselborn's initial use of the garage door opener at 1819 South Michigan violative of the Fourth Amendment. If the garage was common to other residents of the

building, the use of the opener was akin to the use of the key fob and, thus, not a search at all.  If the garage was private to unit 702 (although Defendants do not suggest that it was), its use was more like the *Concepcion* agents' use of the key to apartment 1C.  In either case, SA Asselborn's actions were lawful.

*Concepcion* also forecloses Defendants' argument that SA Asselborn somehow improperly interfered with their Fourth Amendment-conferred "possessory interest" in the keys.  And to the extent that Defendants challenge SA Asselborn's unsuccessful attempts to open the garages attached to neighboring buildings, they lack a reasonable expectation of privacy in those buildings to do so.  See *Minnesota v. Carter*, 525 U.S. 83, 90 (1998).

### D. Correa's Consent to Search Unit 702

Having deemed lawful the agents' actions that preceded Correa's alleged consent to search unit 702, all that remains is the credibility issue of whether Correa actually consented to the search.  Correa points to the absence of a written consent form and GS Laverty's failure to contemporaneously record the event as evidence that he never consented at all.  Though not contemporaneous, GS Laverty did memorialize the event in the DEA report: "At approximately 4:50pm, GS Laverty and TFO Perez spoke with Correa at the Chicago Field Division.  GS Laverty, as witnessed by TFO Perez, was granted verbal consent to search unit #702 at 1819 S. Michigan, Chicago, IL (see DEA 6 written to case file by SA Asselborn, titled 'Post Arrest Interview of Jason Correa on 10-27-11')."  Gov. Opp. Ex. A at 3.  As noted, the consent was witnessed by both GS Laverty and TFO Perez and contemporaneously relayed to SA Asselborn, who then searched the unit.  Further, the Court found the suppression hearing testimony of both GS Laverty and SA Asselborn to be credible.  GS Laverty testified, and SA Asselborn's testimony corroborated, that after Correa consented, Laverty immediately called SA Asselborn to

relay it. Tr. at 28, 124. Although written consent is not constitutionally required, see *U.S. v. Dean*, 550 F.3d 626, 631 (7th Cir. 2008), GS Laverty testified that he, in fact, asked Correa to sign a consent form, but Correa refused to sign it. Tr. at 125. Moreover, the Defendants have offered (and the Court has found) no reasons to doubt the agents' credibility. On the other hand, the Court found Correa's testimony to be evasive at times and notes his substantial motivation to avoid a conviction by shading the truth. For the reasons given, the Court credits the testimony of GS Laverty and SA Asselborn and finds that Correa voluntarily consented to a search of unit 702.

### E. Correa's Authority to Consent to Search Unit 702

Melero argues that Correa lacked apparent authority to consent to a search of the unit. In response, the Government contends that Correa had both apparent and actual authority to consent. "Apparent authority turns on whether the facts available to the officer at the time would allow a person of reasonable caution to believe that the consenting party had authority over the premises." *U.S. v. King*, 627 F.3d 641, 648 (7th Cir. 2010). Melero asserts, without citing any supporting case law, that mere possession of keys is not enough to bestow apparent authority. Correa, though, possessed more than a mere key to the unit. He had a mailbox key, which suggested that he was using the unit as his mailing address. He also had a working garage door opener that gave him parking privileges at the home, as well as an electronic key fob that allowed him access to the lobby. The fob and garage door opener are particularly indicative of authority, because they are much more difficult to copy than a typical metal house key, making it unlikely that they were someone else's spare set. Possession of these items, therefore, suggests both "use of and access to the property," which are the "touchstone[s] of authority." *U.S. v. Chaidez*, 919 F.2d 1193, 1201 (7th Cir. 1990). Finally, Correa was only one block from the unit

14

when the agents pulled him over, and by Correa's own admission, he was driving to the unit's exact intersection. Tr. at 214. That proximity only added to the reasonableness of the agents' belief that he had authority over the premises.

While certainly possible that the unit was not Correa's primary residence – as implied by the fact that SA Asselborn recovered the keys from a bag that included "a bunch" other keys and garage door openers – that possibility does not render Correa without authority to consent to its search. *King*, 627 F.3d at 648 (quoting *U.S. v. Matlock*, 415 U.S. 164, 171 n. 7 (1974) ("The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes.")). Nor, as Melero suggests, did the agents have a duty to inquire further as to Correa's authority. *Id.* (citing *U.S. v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010) (making clear that "officers have a duty to inquire further as to a third party's authority only 'when the circumstances make the authority questionable in the first place'"). For these reasons, the Court is convinced that a person of reasonable caution would believe Correa had authority over the premises. Because the Court finds that Correa had apparent authority to consent, the agents' search of unit 702 was proper and the Court need not determine whether Correa also had actual authority.

F.   **Probable Cause to Arrest Melero**

Lastly, Melero argues that the agents lacked probable cause to arrest him, because the neighbor who visually identified Melero as an occupant of the unit did not identify him by name. Melero, however, cites no support for this proposition. "[P]olice may arrest someone outside of the home when they have probable cause to believe that a suspect has committed, is committing, or is about to commit an offense." *U.S. v. Slone*, 636 F.3d 845, 847 (7th Cir. 2010). Probable

15

cause is defined "in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotations omitted). Here, agents had ample reason – including a birth certificate, marriage certificate, passport photo, and court documentation – to believe that a person named Saul Melero lived in the unit. The unit, of course, contained a mountain of evidence connecting its occupants to illegal drug activity. Neighbors had already demonstrated their familiarity with the residents of unit 702 by identifying Correa from a photo as one of the unit's two residents. So although the neighbor did not know Melero by name, the agents could reasonably conclude that the man he identified was Saul Melero. Regardless, the agents had probable cause to arrest anyone they believed to be a resident of unit 702 – Saul Melero or not – given the criminal activity that was clearly taking place inside it. Because it was entirely reasonable of the agents to believe Melero to be a resident of the unit, and thus to be involved in substantial criminal activity, they had probable cause to arrest him.

### III.     Conclusion

For the reasons stated above, Defendants' motion to suppress [74, 75] is denied.

Dated: October 17, 2013

Robert M. Dow, Jr.
United States District Judge

16